# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| IPS CORPORATION, a Delaware Corporation, and WELD-ON ADHESIVES, INC., a California corporation,<br><br>        Plaintiffs,<br><br>        v.<br><br>MARK BROWN, an individual, and MPS ADHESIVES, LLC, a California limited liability company,<br><br>        Defendants. | Case No.<br><br>Judge<br>Magistrate Judge<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR INJUNCTIVE RELIEF, DAMAGES, AND OTHER RELIEF

Plaintiffs IPS Corporation ("IPS") and Weld-On Adhesives, Inc. ("Weld-On") bring this Complaint for immediate injunctive relief and damages against Defendants Mark Brown ("Brown") and MPS Adhesives, LLC ("MPS") (collectively referred to herein as "Defendants"), and hereby allege and state as follows:

## NATURE OF THE ACTION

1. This is an action for Defendants' violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 ("DTSA") and Brown's breach of contract, for which Plaintiffs seek immediate injunctive relief and damages in an amount to be determined at trial.

2. This action arises from Defendant Brown's theft and misuse of proprietary piping product formulations and manufacturing parameters, both individually and through his corporation, MPS.

3. Weld-On products are globally-recognized as the premium products for joining plastic pipes, valves, and fittings.

4. Brown, a chemist and former Technical Director of Research and Design of IPS, either individually or through MPS, has been shopping Weld-On's proprietary piping product formulations and processing parameters to the highest bidder in order to form a partnership for the manufacture, distribution, and sale of Weld-On's proprietary piping product formulations.

5. Weld-On has recently learned that Brown, either individually or through MPS, has found a partner in at least Pidilite Industries, and they intend to commence the manufacture and sale of Weld-On formulations on or around May 15, 2018, usurping the cost and time expended by Weld-On in the research and development of that information and providing Brown and/or MPS with an improper head start and unfair position in the marketplace that they otherwise would not have had without such access.

6. Plaintiffs seek immediate, preliminary, and permanent injunctive relief to prevent irreparable harm from the continued use and disclosure of IPS's and Weld-On's confidential, proprietary, and trade secret information.

## PARTIES, JURISDICTION, AND VENUE

7. Plaintiff IPS Corporation is a Delaware corporation with its principal place of business in Compton, California.

8. Plaintiff Weld-On Adhesives, Inc. is a California corporation with its principal place of business in Compton, California.

9. Upon information and belief, Defendant Brown is a California citizen, with his principal residency at 9216 Tweedy Ln, Downey, CA. Brown is the President and Technical Director for MPS.

10. Defendant MPS is a California limited liability company with its principal place of business in Carpentersville, IL.

11. This Court has personal jurisdiction over Defendant MPS, pursuant to 735 ILCS 5/2-209, because MPS is a corporation that transacts business in Illinois and because it committed, in substantial part, the underlying acts alleged herein in Illinois.

12. This Court has personal jurisdiction over Defendant Brown pursuant to 735 ILCS 5/2-209, because Brown committed, in substantial part, whether individually or acting in concert and participation with MPS, the underlying acts alleged herein in Illinois.

13. Subject matter jurisdiction is proper for the DTSA claims in this Court pursuant to 18 U.S.C. § 1836(c), because this is a civil matter over which this Court has general and original jurisdiction.

14. Subject matter jurisdiction is proper for the breach of contract claims in this Court pursuant to 28 U.S.C. § 1367, because such claims are so related to Plaintiffs' DTSA claim that they form part of the same case or controversy under Article III of the United States Constitution.

15. Venue before this Court is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, or a substantial part of property that is the subject of the action is situated in this judicial district.

## FACTUAL BACKGROUND

## THE HISTORY OF WELD-ON

16. For over 60 years, IPS has been a market leader in pipe-joining products, and its brand, Weld-On®, is the global leader of solvent cements, primers, sealants, cleaners, and accessories for PVC, CPVC, ABS, and other plastic piping systems. IPS and Weld-On offer contractors, pipe fitters, plumbers, and fabricators a portfolio of proven, reliable, time-saving, and professional-grade products.

17. In 1958, IPS (previously known as Industrial Polychemical Service, Inc.) pioneered the solvent welding technique and patented solvent cement for use on thermoplastic pipe and fittings. This technique and product revolutionized plumbing in the United States by making plastic pipe installation easy, time-saving, and convenient.

18. In 1991, Weld-On Adhesives, Inc. was created as a stand-alone corporate entity to promote and market the Weld-On® brand, as well as continue and assist in the research and development efforts initiated by IPS. In 1992, Weld-On formulated and introduced the first Low VOC (volatile organic compound) emission solvent cement in response to growing air quality concerns.

19. In 1997, Weld-On introduced 724®. It was the first high strength solvent cement for chemical resistant CPVC plastic joints in the market and formulated for use in a variety of harsh chemical applications such as hypochlorites, acids, and caustics.

20. In 2009, Weld-On became the first company in the industry to offer environmentally-responsible, all Low VOC solvent cements, primers, and cleaners, and completely phase out regular VOC products. All Weld-On PVC and CPVC cements now meet the requirements for Low VOC (Volatile Organic Compound) emission limits, established by the California South Coast Air Quality Management District (SCAQMD) – one of the most stringent regulations in the U.S.

21. In 2017, Weld-On developed and introduced an even more eco-friendly solvent cement. 905ECO™ has up to 30% less solvent emissions and reduced odorous fumes than current solvent cements in the market. The significant reduction of vapors during product usage makes for an improved workplace environment. This patent-pending new technology has a proprietary compound that greatly increases bond-strength and uses significantly less aggressive solvents and

yet, the 905ECO performs equal to or better than the comparable solvent cements with greater VOC's.

22. Today, Weld-On products are globally-recognized as premium products for joining thermoplastic pipes, valves, and fittings. The products are qualified for use in a variety of plastic piping applications such as potable water, irrigation, pool & spa, industrial, fire protection, conduit, drain-waste-vent, and sewer. Weld-On's products are widely used in interstate and foreign commerce.

23. Because these products are used in vital systems, Weld-On invests heavily in its research and development of pipe-joining product formulations.

24. Thus, Weld-On expends great energy and resources in the creation of the appropriate formulation and mixture of elements and materials, so that Weld-On can produce the appropriate joining products for the various applications of plastic piping systems.

25. As a result of Weld-On's continuous research and development, Weld-On has set the benchmark for innovative and high-quality pipe-joining products.

26. Weld-On has developed and maintained the secrecy of the formulations and manufacturing specifications of its products for joining various piping systems, which carry product codes such as 705™, 714™, 717™, etc.

27. Each Weld-On product code has a specific product formulation, and a Master Formulation Sheet for each product contains this formulation, along with the unique process of manufacturing, including the percentage of each ingredient, the order of addition of the ingredients, the process of mixing the ingredients, and the specific time and temperature used to make the final product.

28. Some of these formulations have essentially remained the same for the past 20 years, and despite efforts in the industry, no other manufacturer has been able to replicate the quality, consistency, and breadth of the products sold globally by Weld-On.

29. These formulations are created and maintained for the benefit of both Weld-On and IPS.

30. Because of the uniqueness and time and effort in developing its products, Weld-On provides multiple levels of security to ensure that the formulas, processes, bill of materials, and operating procedures, utilized to produce the solvent cement products remain proprietary and they are only available to select Weld-On employees.

31. The Master Formulation Sheets containing this proprietary information are digitally stored on a secured server, where access is limited only to those involved in the developmental efforts and a select few individuals responsible for Production Planning. Access to this server requires Senior Management approval and a passcode.

32. Weld-On has a controlled system where the Master Formulation Sheets are provided to only a select few individuals when necessary for producing the mixture. These documents are used in the manufacturing of each batch and are printed by the Production Planners and handed to the select individuals who are responsible for mixing each batch. Once the mixture is complete, internal controls require the printed documents to be returned to the Quality Control lab where they are stored under constant supervision of QC employees before they are transferred to another secure location where they are stored under lock and key. After three years of storage, the paper copies of batch sheets are destroyed. The facility where these documents are stored requires both keyed access as well as entry of a security code. During non-business hours, the

security system monitors which employee enters the facility by tracking the code entered into the system.

33. The Weld-On manufacturing facility in Gardenia has a Video Surveillance System in place, and all gates allowing access to the premises are monitored via Closed Caption Television. All of these gates are locked during off-hours and require a remote control or key for entry. A full alarm system is also in place for all of the buildings during off-hours. The front lobby doors require a security code, and a non-IPS person is required to sign a log and must be visually inspected by a Weld-On or IPS employee before entering the facility.

34. Weld-On further protects its information by requiring its personnel to sign agreements containing confidentiality covenants; limiting access to confidential information; utilizing computer passwords; limiting access to offices and documents; monitoring who is given access to confidential information; instructing personnel not to show any confidential information to clients or others outside Weld-On; and requiring all confidential and proprietary materials to be used for company purposes only.

35. Weld-On's proprietary information is not generally known in the industry and is valuable because Weld-On derives economic value from the information not being publicly available.

36. Weld-On's proprietary business and technical information is of great value to Weld-On and such information would give any competitor who improperly acquired such information a head start on development and an unfair competitive advantage.

37. In addition to its proprietary pipe-joining product formulations and manufacturing process, Weld-On's brand has global recognition, with a distinctive logo and label design that has become a valuable corporate asset of Weld-On.

## BROWN'S EMPLOYMENT AT WELD-ON

38. Mark Brown is a former Technical Director of Research & Design, who worked for IPS for over twenty-years.

39. Brown started his employment with IPS on or about April 15, 1985 as a chemist.

40. On or about November 2003, Brown became the Technical Director of Research and Design of IPS. In his capacity as Technical Director of IPS, Brown was responsible for, among other things, overseeing the development of new products, directing activities of Quality Control functions involved in adhesive manufacturing operations, and overseeing internal and external regulatory compliance.

41. In his role, Brown was given access at the highest level of security clearance to the Weld-On® formulations, ingredient mixtures, and manufacturing processes. This access included access to Weld-On Master Formulation Sheets.

42. In addition to the general confidentiality obligations imposed on all IPS and Weld-On employees, Brown was further required to execute additional restrictions, in exchange for the provision of stock options.

43. On or about December 21, 2006, Brown signed two Non-Qualified Stock Option Agreements for the benefit of IPS and Weld-On. The first was made and entered into by and between IPS Intermediate Holdings Corporation ("IPS Intermediate") and Brown. A copy of this agreement is attached hereto as Exhibit A.

44. The second Non-Qualified Stock Option Agreement was made and entered into by and between IPS Structural Adhesives Holdings, Inc. ("IPS Structural") and Brown. A copy of this agreement is attached hereto as Exhibit B. IPS Structural is a related company of IPS Intermediate.

45. The two Non-Qualified Stock Option Agreements are collectively referred to herein as the "Stock Option Agreements."

46. The Stock Option Agreements executed by Brown contain identical provisions restricting Brown from disclosing or using any non-public information relating to IPS Intermediate and/or IPS Structural and any of their Parent, Related, or Subsidiary companies, including IPS and Weld-On. (Exhibit A, ¶ 13; Exhibit B, ¶ 13)

47. Upon his commencement of work for IPS, and at various meetings throughout his tenure at on the companies, Brown was instructed by the companies regarding the confidentiality of IPS's and Weld-On's proprietary information and trade secrets received by employees like Brown.

48. In 2009, as a result of the significant downturn in the economy, as well as a business restructuring, which included a nearly 20-25% reduction in the workforce, Brown's employment was terminated.

49. Prior to his termination, Brown, on behalf of IPS and Weld-On, was working for about one year on a project to produce a solvent cement for Durman Esquivel S.A. ("Durman"). A final deal between Weld-On and Durman was imminent but had not yet been finalized at the time of Brown's termination. Shortly after Brown's termination, Weld-On received notification from Durman that the project would be put on hold indefinitely. Weld-On, based on information it received, suspected that Brown had misappropriated Weld-On's trade secrets in doing business with Durman.

50. In response to Weld-On's investigation and notification of its concerns, Brown assured Weld-On that he had not removed any documentation from Weld-On and was not using any confidential or trade secret information.

51. Weld-On trusted and relied on Brown's assurances and did not pursue further action at that time.

52. Over the past few years, Brown has resurfaced in the solvent cement industry, and, over the past few weeks, there has been a flurry of reports of Brown's use and sale of the Weld-On formulations and processes.

## BROWN MISAPPROPRIATED WELD-ON'S TRADE SECRETS

53. Specifically, Weld-On learned in mid-2017 that Brown partnered with an Indian company, HP International, to make, package and/or ship solvent cement products in Carpentersville, IL through a company known as MPS Adhesives, LLC ("MPS").

54. Brown reported himself as the Technical Director of MPS as well as the President of MPS.[1]

55. MPS represents itself as a supplier of plastic pipe cements, industrial adhesives, and structural adhesives to Europe, America, Middle East, and Asia.[2]

56. Within the past few months, Brown and HP International apparently had a falling out.

57. While Brown is no longer restricted from competing against Weld-On, his confidentiality obligations remain in place.

58. Over the past few weeks, Weld-On has been alerted to multiple concerning activities by Brown, including, but not limited to: (a) Brown's retention and use of Weld-On Master Formulation Sheets; (b) the provision and/or sale of those Weld-On Master Formulation

---

[1] https://gineersnow.com/tv/leaderstalk-mps-adhesives-mark-brown-president (embedded video captures Brown introducing himself as President and Technical Director of MPS)

[2] https://www.mpsadhesives.com/about-us/

Sheets to Weld-On competitors in the marketplace; and (c) the effort to reproduce Weld-On formulations and sell those products into the global market.

59. Specifically, Weld-On has received evidence of Brown, either individually or through MPS, sharing Weld-On Master Formulation Sheets in the marketplace, and has received specific notification of his partnership with both Pidilite Industries, an Indian-based adhesives manufacturing company, and a company referred to as Korean Adhesive Acrylics. Brown has provided or agreed to provide Weld-On Master Formulation Sheets to these companies, either directly or in partnership therein.

60. On April 8, 2018, Weld-On learned that Brown, either individually or through MPS, was sharing Weld-On Master Formulation Sheets with multiple companies across the world in order to find a business partner for the manufacture, distribution, and sale of Weld-On formulations. Notably, MPS's global business model "encourage[s] global distribution & OEM partnerships."[3]

61. Also, on April 8, 2018, Weld-On learned that at least three of Weld-On's proprietary Master Formulation Sheets for solvent cements (Weld-On 705™, 717™, and 714™) ("Misappropriated Formulation Sheets") had been shared by Brown with various adhesive companies across the world, including, but not limited to, Pidilite Industries, and HP International. Each of these three Misappropriated Formulation Sheets include the product composition, the order of addition of the ingredients, the process of mixing the ingredients, and the specific time and temperature used to make the final product. Moreover, these three Misappropriated Formulation Sheets span from 1995 – 2007, years during which Brown was employed with Weld-On and prior to his termination in 2009.

---

[3] https://www.mpsadhesives.com/about-us/

62. Specifically, Weld-on received, from an anonymous source, the exact proprietary Misappropriated Formula Sheets with explicit statements from that source that Brown was attempting to sell the formulations and processing parameters to Pidilite and others.

63. Notably, MPS supplies products in direct competition with Weld-On's products, including a Pro-Weld product identical to each of these three Misappropriated Formulation Sheets: Pro-Weld 5705, 5717, and 5714.

64. In fact, MPS's product numbers are nearly identical to the equivalent Weld-On product, the only difference being Pro-Weld adds a "5" in front of the equivalent Weld-On product number. For example, the Pro-Weld 5717 product has the identical product use (heavy bodied, medium setting, low VOC PVC cement for pipe sizes with interference fit through 12") to the Weld-On 717™ product. This is the same for Pro-Weld's 5700 (Weld-On 700™), 5705 (Weld-On 705™), 5714 (Weld-On 714™), to name a few more examples.

65. The similarities of the products do not end there. The Safety Data Sheets ("SDS"), which by OSHA requirement list generic ingredient references and concentration percentages of certain chemicals, are also identical. For example, the Pro-Weld 5717 SDS, which is attached hereto as Exhibit C, lists three chemicals: Tetrahydrofuran at 25-70% concentration % by weight, Methyl Ethyl Ketone at 5-36% concentration % by weight, and Cyclohexanone at 10-25% concentration % by weight. The Weld-On 717 SDS, which is attached hereto as Exhibit D, is identical to the Pro-Weld 5717™ SDS.

66. After further investigation, on April 25, 2018 Weld-On learned that Brown, either individually or through MPS, was attempting to finalize a contract with Pidilite Industries, an Indian-based adhesives manufacturing company, relating to the manufacture and sale of Weld-On

formulations and process parameters. Weld-On also learned that Brown had shared Weld-On Master Formulation Sheets with additional companies, including Durman.

67. The only other team member identified on MPS's website is the Vice-President of Business Development, who notably claims to have "over 10 years of experience in international sales with Pidilite Industries." Mr. Vachhani represents himself as located in Chicago, Illinois.

## WELD-ON NEEDS IMMEDIATE AND PERMANENT INJUNCTIVE RELIEF

68. On May 7, 2018, Weld-On learned that Brown, either individually or through MPS, had been working with Atul Bhatia, Head of Research and Development at Pidilite, since January 2018 and that they intend to commence the manufacture, distribution, and sale of Weld-On formulations on or around May 15, 2018.

69. MPS Adhesives represents that it manufactures its products—including the suspected infringing products—in a facility in Carpentersville, IL.

70. Brown's misappropriation of Weld-On Master Formulation Sheets threatens the very foundation of the Weld-On® brand, and threatens to significantly impair IPS's and Weld-On's reputation and goodwill that they have spent over 60 years developing in the market place.

71. If Brown and MPS are not immediately required to cease their disruptive and illegal activities, the harm done to IPS and Weld-On will be irreparable and irreversible, for which money damages will not make IPS and Weld-On whole.

72. To prevent this harm, IPS and Weld-On now seek immediate and permanent injunctive relief against Brown, MPS, and all others acting in active concert with Brown, including, but not limited to Pidilite Industries.

## COUNT I

### Actual and Threatened Misappropriation of Trade Secrets

[Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836]

73. Plaintiffs incorporate by reference all allegations in all preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

74. The proprietary business and product information of IPS and Weld-On, including, but not limited to, formulas, processes, bill of materials, standard operating procedures, and methods utilized to create Weld-On's piping product formulations ("Weld-On Trade Secrets"), which were accessed by and used by Brown, constitute trade secrets under 18 U.S.C. § 1839.

75. The Weld-On Trade Secrets relate to products and services used in or intended for use in interstate and foreign commerce, and derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from the disclosure or use.

76. IPS and Weld-On invested substantial time and millions of dollars in developing and maintaining the Weld-On Trade Secrets. The Weld-On Trade Secrets are not known outside of IPS and Weld-On, and could be learned by others, if at all, only by the expenditure of considerable time, effort, and expense.

77. The Weld-On Trade Secrets are and have been the subject of efforts that are reasonable under the circumstances to maintain their secrecy. Those efforts include, but are not limited to, contractual duties under employment agreements, including the Stock Option Agreements signed by Brown, and other physical and electronic policies and procedures as set forth above.

78. Brown acquired knowledge of the Weld-On Trade Secrets in confidence and as a result of his contractual and confidential relationship with, and his promises to and his agreements with, Weld-On.

79. Brown explicitly acknowledged the following in his Stock Option Agreements: "From and after the Date of Grant, [Brown] shall maintain the confidentiality of all non-public information relating to the Company, any Parent and any of the Company's Related Companies or Subsidiaries." (Exhibit A, ¶ 13; Exhibit B, ¶ 13)

80. The Weld-On Trade Secrets have been used or disclosed by Brown, either individually or through MPS, in violation of Brown's contractual duties to maintain their secrecy.

81. Brown and MPS have and will continue to misappropriate the Weld-On Trade Secrets by, among other acts and omissions, engaging in the conduct alleged herein, including, but not limited to:

(a) disclosing and using the Weld-On Trade Secrets without Weld-On's express or implied consent after acquiring knowledge of such trade secrets by MPS and inducing Brown to breach his contractual duties to Weld-On to maintain the secrecy thereof;

(b) disclosing and using the Weld-On Trade Secrets without Weld-On's express or implied consent when, at the time of their disclosure and use, MPS knew or had reason to know that the knowledge of the Weld-On Trade Secrets was derived from or through a person who owed a duty to Weld-On to maintain the secrecy of the Weld-On Trade Secrets or limit the use of the Weld-On Trade Secrets; and

(c) disclosing and using the Weld-On Trade Secrets without Weld-On's express or implied consent when, at the time of their disclosure and use, Brown and MPS knew or had reason to know that Brown's knowledge of the Weld-On Trade Secrets was acquired under

circumstances giving rise to a duty to maintain the secrecy of the Weld-On Trade Secrets or limit the use of the Weld-On Trade Secrets.

82. Brown and MPS have used and continue to use the misappropriated Weld-On Trade Secrets in the furtherance of Brown's and/or MPS's business operations, in unfair competition with Weld-On.

83. As a direct and proximate result of the foregoing, Plaintiffs have suffered damages in an amount to be determined at trial.

84. Moreover, Plaintiffs have suffered irreparable harm for which there is no adequate remedy at law, and will continue to suffer irreparable harm unless this Court enjoins Brown and MPS from further misappropriating the Weld-On Trade Secrets.

85. Finally, by way of Brown's and MPS's willful and malicious misappropriation of the Weld-On Trade Secrets, Plaintiffs are entitled to an award of exemplary damages and reasonable attorney's fees.

## COUNT II

### Breach of Contract

86. Plaintiffs incorporate by reference all allegations in all preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

87. The Non-Qualified Stock Option Agreement by and between IPS Intermediate and Brown ("IPS Intermediate Agreement") is a valid and enforceable contract.

88. The Non-Qualified Stock Option Agreement by and between IPS Structural and Brown ("IPS Structural Agreement") is a valid and enforceable contract.

89. IPS has fully performed or tendered all performance required under the IPS Intermediate Agreement.

90. IPS has fully performed or tendered all performance required under the IPS Structural Agreement.

91. Brown has breached his obligation to IPS Intermediate as set forth in the IPS Intermediate Agreement by failing to maintain the confidentiality of all non-public IPS and Weld-On information, including, but not limited to, the Weld-On Trade Secrets.

92. Brown has breached his obligation to IPS Structural as set forth in the IPS Structural Agreement by failing to maintain the confidentiality of all non-public IPS and Weld-On information, including, but not limited to, the Weld-On Trade Secrets.

93. As a direct and proximate result of Brown's wrongful conduct, Plaintiffs have suffered and continue to suffer irreparable injury.

94. As a direct and proximate result of Brown's wrongful conduct, Plaintiffs have suffered and continue to suffer substantial money damages in an amount to be determined at trial.

**WHEREFORE**, IPS Corporation and Weld-On Adhesives, Inc. pray for the following relief:

(i) That Defendants, along with their respective agents, servants, employees, attorneys, and all parties in active concert or participation with them, be preliminarily enjoined from using and/or disclosing Plaintiffs' trade secret, confidential, and/or proprietary information, including, but not limited to, Weld-On Master Formulations Sheets;

(ii) That Defendants, along with their respective agents, servants, employees, attorneys, and all parties in active concert or participation with them, be ordered to return all confidential and/or proprietary information belonging to Plaintiffs, in both hard copy and electronic form, within twenty-four (24) hours of its discovery;

(iii) That Defendants identify all third parties to whom they revealed Plaintiffs' trade secret, confidential, and/or proprietary information;

(iv) That Defendants, along with their respective agents, servants, employees, attorneys, and all parties in active concert or participation with them, be preliminarily enjoined from developing, producing, manufacturing, and/or selling any product based in whole or in part on any of Plaintiffs' trade secret, confidential, and/or proprietary information, including, but not limited to, Weld-On Master Formulations Sheets;

(v) That Defendants, along with their respective agents, servants, employees, attorneys, and all parties in active concert or participation with them, be required to identify any and all MPS products that are based in whole or in part on any IPS or Weld-On formulation or process and/or other IPS or Weld-On trade secret, confidential, and/or proprietary information;

(vi) That Defendants produce for inspection each and every formulation and process of manufacture, and any iterations thereof, from which Defendants, along with their respective agents, servants, employees, attorneys, and all parties in active concert or participation with them, have made, produced, and/or sold any pipe-fitting products;

(vii) That Plaintiffs be granted expedited discovery, including the turnover to a third party forensic expert of all electronic devices in the possession of Defendants;

(viii) That Defendants be ordered to produce for inspection and imaging all computers and other electronic media belonging to, under the control of, accessible to, or operated by Defendants that may contain Plaintiffs' trade secret, confidential, and/or proprietary information;

(ix) That Plaintiffs be awarded past and future damages, including reasonable royalties under the DTSA, and a constructive trust over MPS's business operations for the benefit of Plaintiffs in an amount to be determined at trial;

(x) That Plaintiffs be awarded the cost and expenses related to the lost investment in the development of the formulations and processes improperly received by Defendants;

(xi) That Plaintiffs be awarded exemplary damages in an amount 2 times the amount of the past damages under the DTSA;

(xii) That Plaintiffs be awarded punitive damages;

(xiii) That Plaintiffs be awarded relief to compensate for Defendants' unjust enrichment;

(xiv) That Plaintiffs be awarded reasonable attorney's fees pursuant to the DTSA;

(xv) That Plaintiffs be awarded the costs of this action; and

(xvi) That Plaintiffs be awarded any and all other relief to which Weld-On appears entitled.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demands a trial by jury on all matters so triable.

Dated: May 15, 2018.　　　　　　　　　　IPS CORPORATION and WELD-ON ADHESIVES, INC.

By　/s/ Jason P. Stiehl
　　Jason P. Stiehl
　　John A. Cotiguala
　　Loeb & Loeb LLP
　　321 North Clark Street, Suite 2300
　　Chicago, IL  60654
　　Telephone: (312) 464-3100
　　Facsimile:  (312) 464-3111
　　jstiehl@loeb.com
　　jcotiguala@loeb.com